ROSEDALE–SKINKER IMPROVEMENT ASSN., Inc., a Corporation, and Michael Jos. Hart, Stephen Sinclare, Lawrence H. Stern, Trustees of Parkview, Appellants,

and

Arthur J. Freund and Margaret D. Freund, Intervenors-Appellants,

v.

The BOARD OF ADJUSTMENT OF the CITY OF ST. LOUIS, Thomas Bear, M. A. Beffa, Robert Kinealy, Clarence Ax and L. A. Maginn, In their capacity as Members of the Board of Adjustment, and Southwestern Bell Telephone Company, a Corporation, Respondents.

No. 53064.

Supreme Court of Missouri, En Banc.

March 11, 1968.

Rehearing Denied April 8, 1968.

Richard C. Hart, St. Louis, for plaintiffs-appellants.

Shulamith Simon, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for intervenors—plaintiffs-appellants.

John Mohler, Michael Grove, St. Louis, for respondent, Southwestern Bell Telephone Company.

Thomas F. McGuire, City Counselor, St. Louis, for respondent, The Board of Adjustment of the City of St. Louis.

STORCKMAN, Judge.

This certiorari proceeding, filed in the Circuit Court of the City of St. Louis, attacks the legality of a building permit which the St. Louis Board of Adjustment ordered to issue under the powers granted it by § 916.050(4) of the Zoning Code. The Board found that a variance in the height of the proposed structural addition was justified because of a practical difficulty and unnecessary hardship. The application of Southwestern Bell Telephone Company for a permit to erect an addition to its building at 6214 Delmar Boulevard was refused by the Building Commissioner of the City of St. Louis. Bell Company appealed to the Board of Adjustment which conducted hearings and ordered issuance of the permit. The plaintiffs in the certiorari proceedings, in addition to the Improvement Association, are the trustees and two resident owners of a home in Parkview, a subdivision located south of and across an alley from the existing building and the proposed addition. No additional evidence was offered in the circuit court and the order of the Board of Adjustment was affirmed on the record made before the Board. The plaintiffs appealed to the St. Louis Court of Appeals which adopted an opinion reversing the judgment and remanding the cause with directions to affirm the refusal of the Building Commissioner to issue the permit. The case was transferred here on order of this court where it will be reviewed as an original appeal. Art. 5, § 10, 1945 Constitution of Missouri, V.A.M.S.

The main contentions of the plaintiffs on this appeal are that the Board of Adjustment exceeded its jurisdiction in granting the height variance because it had no authority to hold a second hearing and to reverse its original ruling, that no practical difficulty or unnecessary hardship was established by Bell Company or found by the Board, and that the Board's order was illegal in that it constituted a repeal of § 910.050 of the Zoning Code regulating the height of buildings in the "G" district.

Two hearings were held before the Board of Adjustment. After the first hearing the Board entered an order on February 17, 1965, sustaining the decision of the Building Commissioner on two grounds: (1) that the erection of the new structure would reduce the space for off-street parking below the requirements of the Zoning Code in violation of § 903.080, and (2) that the proposed building exceeded the height limitations of § 909.050 and no practical difficulty or unnecessary hardship had been shown. Thereafter Bell Company acquired land adjoining its property on the west which would provide more parking spaces than required by the ordinance. On March 17, 1965, Bell filed its motion for a rehearing which was granted. The rehearing was held on April 28, 1965, at which time the order of which plaintiffs complain was entered.

The plaintiffs urge that neither the enabling statutes nor the ordinances constituting the St. Louis Zoning ordinance authorize the Board of Adjustment to grant a rehearing. Chapter 916 of the Zoning Code, relating to the Board of Adjustment, follows quite closely the enabling statutes, §§ 89.080 to 89.110, RSMo 1959, V.A.M.S. Although rehearings are not expressly authorized, they are not prohibited during the time the Board is vested with jurisdiction of the application. Section 89.100 and § 916.040 provide that when the building commissioner is notified of an appeal from his decision he shall transmit to the Board all papers filed with him and the appeal stays all proceedings in furtherance of the action appealed from unless the stay is vacated under conditions and by means not material here. Any person aggrieved by a decision of the Board has thirty days to petition the circuit court for review. Section 89.110 and the second paragraph of § 916.050(5). Within these limits the Board is vested with jurisdiction of the application.

In exercising its powers, the Board "may make such order, requirement, decision or determination as ought to be made,

and to that end shall have all the powers of the building commissioner or the board of public service." Section 916.050(5). "The power to reopen a cause before a board of appeals, should not be interpreted with too much refinement, nor should it be hedged about with too much technicality, if, in the meantime, no rights have arisen which would be injured by a reopening of the subject and if *material, new* conditions have arisen." Metzenbaum, Law of Zoning, Vol. 2, Second Edition, p. 900. This rule of construction is reasonable and just; it is consistent with the pertinent statutes and ordinances in this case. To the same effect, see 58 Am.Jur., Zoning § 227, p. 1060, and 101 C.J.S. Zoning § 218, p. 978. The appellants also assert that changed circumstances based on the acquisition of additional parking area should have been presented to the building commissioner and not to the Board of Adjustment. As previously noted, the building commissioner, pursuant to § 916.050(5), was divested of jurisdiction by reason of the appeal, and his powers were conferred upon the Board of Adjustment. The Board had jurisdiction of the application at the time it granted and held the rehearing. The contention that the Board of Adjustment had no authority to grant the rehearing and to reverse its original ruling is denied.

The appellants' next contention is that the applicant Bell Company did not establish any practical difficulties and unnecessary hardships and none were found by the Board. In their written argument the appellants state that "there was absolutely no evidence, nor any finding by the Board, of any hardship arising out of the peculiar topography or condition of the particular piece of land involved. The physical characteristics of the parcel of ground were not mentioned." This thesis is carried through in all of the plaintiffs' briefs filed here and in the court of appeals. In fact the opinion of the court of appeals in this case appears to adopt this view. In one place it states that "the rule is that a hardship variance may be granted by a board of adjustment only when the nature of the land is such that it cannot be used for purposes permitted by the applicable zoning ordinance." The appellants rely strongly upon Brown v. Beuc, Mo.App., 384 S.W.2d 845, a prior opinion of the St. Louis Court of Appeals. The opinion of the court of appeals in the *instant case also relies for precedent on the* following quotation from Brown v. Beuc, 384 S.W.2d at page 853: "When we say inherent in the land and that the hardship must be due to conditions not personal to the owner, but rather to conditions affecting the land we mean such hardships as result from the peculiar topography or condition of the land which makes the land unsuitable for the use permitted in the zone in which it lies."

In Brown v. Beuc the landowner had a special permit to use a lot in a residential district for parking automobiles. It sought to eliminate a condition of the permit requiring the observance of a 25-foot-frontyard line in order to accommodate a greater number of automobiles. The Board of Adjustment granted a variance which was affirmed by the circuit court. The court of appeals stated that the lack of adequate parking facilities found by the Board was not unique on the part of the applicant but was general and characteristic of the entire neighborhood surrounding the lot in question, and that the remedy in those circumstances is in a revision of the code by the city legislature and not in the granting of a variance to a single property owner. 384 S.W.2d at page 853. This was sufficient to justify the reversal of the judgment. The reference in the opinion to "the peculiar topography or condition of the land which makes the land unsuitable for the use permitted in the zone in which it lies" was not necessary to the decision and was not based on any specific provision in the St. Louis ordinance or the enabling act.

Some state statutes specifically provide as a ground for variance the exceptional narrowness, shallowness, or shape of a particular piece of property or its exceptional topographic conditions. For example

see New Jersey Statutes Annotated, Title 40:55–39(c) and (d), as applied in Place v. Board of Adjustment etc., 42 N.J. 324, 200 A.2d 601, 604. The Missouri enabling statute and the St. Louis zoning ordinance make no such specification. Section 916.050 (4) of the Zoning Code grants the Board of Adjustment the power to vary the application of the regulations and provisions of the Code in these terms: "In passing upon appeals, where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the zoning code, to vary or modify the application of any of the regulations or provisions of such code relating to [1] the use, construction or alteration of buildings or structures or [2] the use of land so that the spirit of the code shall be observed, public safety and welfare secured and substantial justice done." The numbers in brackets have been added to emphasize the two distinct categories in which variances may be effected. In this case we are concerned with the first category; that is, the regulations and provisions of the Code relating to the construction and alteration of buildings and structures. Land use is not an issue.

■ "Provisions authorizing the grant of variances or exceptions are subject to the usual rules of construction; and particular words or phrases therein must be construed in the light of the ordinance as a whole and with a view to its purposes." 101 C.J.S. Zoning § 279, p. 1044. An annotation on the construction and application of provisions for variations in the application of zoning regulations in 168 A.L.R. at page 17 states the general purpose of such provisions as follows: "Considered as a whole, the cases disclose the twofold purpose of relieving individual owners of unnecessary harship and of protecting the zoning ordinance or regulation against attack on the ground of unreasonable interference with private rights."

■ In accordance with the enabling act, § 89.090(3) and § 916.050(4) of the Zoning Code, the Board of Adjustment is author-ized to vary or modify the strict letter of the Code in applying the regulations and provisions in order to obviate a practical difficulty or an undue hardship, but it is constrained to observe "the spirit of the code", secure "public safety and welfare" and do "substantial justice". The legislation should be construed reasonably to accomplish these purposes. The limitations on the powers of the adjustment boards are well stated by this court in State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.W.2d 1030. There is no all-inclusive definition of what constitutes a sufficient showing of practical difficulty and undue hardship to warrant granting a variance; whether such difficulties or hardships exist is a question of fact as to which the Board of Adjustment is accorded a discretion to be exercised within the guidelines of the zoning legislation. Carlyle-Lowell, Inc. v. Ennis, Mo. App., 330 S.W.2d 164, 168[2]. In Carlyle-Lowell, Inc. v. Ennis, the Kansas City Court of Appeals affirmed a judgment approving the grant of a variance in the application of yard and area regulations so that a 10-story apartment could be built on a lot irregular in shape and grade and crossed by a sewer easement. The opinion states, 330 S.W.2d page 169: "The only common sense conclusion is that the land is subject to practical difficulties which result in unnecessary hardship to the owner." The decision, however, does not limit the granting of variances to conditions "inherent in the land".

■ Section 89.090(3) and § 916.050 (4) are not subject to the limited construction indicated by Brown v. Beuc. If such were the legislative intention, it could have been so stated in direct and unmistakable terms. In determining the meaning and application of statutes, the court must ascertain the legisiative intent from the words used if that is possible, and in doing so give them their plain and ordinary meaning so as to promote the object and manifest purpose of the statutes. State ex rel. Curators of University of Missouri v. Neill, Mo., 397 S.W.2d 666, 669[1]. The topography or

physicial characteristics of the land itself giving rise to difficulties and undue hardships is one, but not the sole, ground upon which variances in the application of zoning regulations may be granted.

The Bell Company has occupied the land in question since 1911 when it built a 3-story telephone exchange and equipment building which was designed to accommodate four stories. Additions were constructed in 1915, 1923, 1938 and 1952. A fourth floor was added in 1923. Since 1952 the entire building has been a 4-story structure, 60 feet in height, 142 feet long, and 109 feet in depth. The building is located in a district zoned "G" commercial. At the time the original building and each addition was constructed, the use and height of 60 feet were well within the zoning requirements. The addition completed in 1952 was erected pursuant to a permit issued in 1950 before the effective date of a change made that year in the zoning ordinance. Since 1950 the applicable amended ordinance as to height has provided: "No building shall exceed 3 stories or 50 feet in height." Since the 1965 application for the addition in question was for a 4-story structure, 60 feet in height, the proposed structure is approximately 10 feet in excess of the height provided by the amended ordinance.

Two hearings were held before the Board of Adjustment at which testimony was heard and exhibits were introduced including photographs of the interior and exterior of the building and the area adjacent to it. The evidence of the applicant Bell tended to show that the proposed addition was to be 60 feet wide and of the same height and depth as the existing building. It was to be a continuation on the west of the existing building and was to be constructed of reinforced concrete with a matching brick exterior. The present building houses a great deal of telephone equipment valued at over $7,500,000. The total investment after the addition is completed will be approximately $10,000,000.

Mr. William Gampfer, building and equipment engineer for Bell, was the principal witness for the applicant. In the course of his testimony he stated: "Let me say, in general terms, we need additional room. We have in this building facilities for 37,000 subscribers. This area is growing. It serves Clayton on the west and Washington University, etc. If we cannot grow in this area, this means we have to go to a new location for a new building. We will have to disrupt service and change telephone numbers and have the normal inconvenience which we are trying not to make which would cost both money and inconvenience to our subscribers if we cannot make this addition." The Company had equipment scheduled to provide for growth in this area and without the addition the service would be in serious trouble right away. The call carrying capacity in this area is increasing more than the Company anticipated. Even if this area was restricted to 37,000 subscribers, there would have to be equipment additions to take care of the increase usage by the 37,000 subscribers. The pictures in evidence show that the building is entirely full of equipment. Because the building is full, additional space for equipment is needed.

Mr. Gampfer further testified that equipment was located on all four floors of the building. The first two floors are dial equipment, boards, central information board, and testing equipment. Pictures showing the type of equipment were introduced in evidence. These pictures show principally the west end of the existing building where thousands of lines terminate to serve the subscribers in this office. The exhibits show the cross-bar type of equipment frames which are 11 feet, 6 inches high, and the horizontal side of the main distributing frame and the type of equipment located there.

The building provides dial service system for Forest Park, Parkview, Overland and Chesterfield with operator systems. Some of the equipment needs to be replaced. The 1985 forecast is that approximately 50,000

lines will be required in the Parkview building which is over its present capacity. The new building would take care of it, however. The photographs of the exterior in evidence also showed some buildings in the neighborhood. Mr. Gampfer further testified that if the addition could not be erected, there would have to be a duplication of facilities. It would be a hardship on the subscribers as to the inconvenience of number changes and the future of good service.

With the high-rise buildings in Clayton, this building serves one-third of Clayton and Washington University. The witness did not know what the ultimate saturation will be. Mr. Gampfer thought that the present building with the proposed addition would take care of the service needs for the next 20 years. The type of equipment used requires the stories of the building to be 15 feet from floor to floor. In replying to a question as to whether there was any engineering reason not to put this equipment in a three-story building, Mr. Gampfer testified: "It is not impossible. However, it is not practical or economical to do it this way. In the existing equipment as shown by the exhibits, is at the end of the line and is adjacent to the wall. We have an obligation to the public of providing the best possible service at the most economical cost. In order to do this, this is why we are requesting this building addition."

At the second hearing additional exhibits were introduced and the traffic and parking problem was shown to have been solved in that by acquisition of additional property on the west space had been provided for parking 21 automobiles which was in excess of the 8 parking spaces required under the ordinance. Mr. Gampfer stated: "I would like to reiterate from the first hearing that we have shown it is absolutely necessary for us to have a 4 story building to house the required equipment to provide adequate and proper telephone service to the people in this area." In response to a question as to whether it would be possible for the equipment to expand horizontally,

Mr. Gampfer stated: "I couldn't tell you in specific detail except I can tell you if you have to expand horizontally there is a possibility we wouldn't have need for the land. To tie the equipment together to have it function, if we have the length of the cables too long there is too much resistance and we cannot function the equipment. It would be economically unpractical to do this." In this regard he further testified: "The alternative we would have to housing all this in one building would be to locate a new wire center or build up an existing one and cut areas to handle the job now handled by this office. We would have to increase some adjacent offices and transfer these subscribers. We would have to expand cable from the other offices and have a severe expense in changing thousands of telephone numbers in order to do this. I can't tell you specifically how we would handle it, we have not approached it on that basis. It would be a terrible burden in cost as far as the public is concerned, thereby affecting the public." He also stated: "If we could not proceed with this plan as we now see it there will be a period of time when it is doubtful if we could get the accommodations in this area. We would have to manufacture equipment in other central offices and a program cable pick these up. Here again without developing a full plan I can't tell you positively this would occur."

At the hearing counsel for Bell Company offered to have Mr. Gampfer testify in more detail about the different kinds of equipment; the chairman of the Board stated that would not be necessary. The photographic exhibits tend to support and demonstrate the need for a continuation of the building at present floor levels and at the same height. The evidence in opposition to granting the variance came principally from the intervenors and counsel for the objectors. The opposing witnesses were of the opinion that the further extension of the building would have a detrimental effect on the subdivision across the alley as a high-grade resident district. The sub-

ject chiefly discussed, however, was the inadequacy of parking space in the commercial district on Delmar. Even after Bell had fully complied in this regard, Mr. Richard C. Hart, a resident of the area and of counsel for the objectors, spoke in some detail of the parking problem, urged the Board to prevent Bell "from enlarging this facility" and asserted that a reversal of the prior decision would impose a hardship on him and the residents of the area. At this point a member of the board stated: "As I understand it, it would be a hardship as to the service. That's the only thing we are interested in is the service to the public." The objections of the opponents seemed to be directed more to preventing the construction of any addition rather than to the granting of the variance of the height regulation by 10 feet.

The Board found that parking space had been provided for 21 automobiles which is "more parking spaces than is required by the Zoning Code", and that the "new structure is needed to house additional telephone equipment because of projected increased subscribers." The conclusions of the Board regarding the height variation and the issuance of the building permit are as follows:

"Regarding the height requirements, the 'G' Commercial District follows the same height regulations as the 'F' Local Business District. Section 909.050 prohibits buildings taller than three (3) stories or fifty (50) feet in height. This new proposed structure will have one-third (⅓) the area of the existing structure. The applicant desires to erect this new structure four (4) stories high to follow the continuity of the existing building. In this case, the Board, under the powers granted to it by Section 916.050(4) finds a practical difficulty and unnecessary hardship to exist and further finds that the spirit of the code will be further served by the erection of this structure.

"Therefore, be it resolved by the Board of Adjustment that the decision of the Building Commissioner in denying the issu-

ance of this permit be reversed and that the previous decision of this Board sustaining the decision of the Building Commissioner, rendered by the Board on February 17, 1965, be reversed and a permit be ordered issued."

■ The enabling act and the zoning code both provide that the concurring vote of four of the five members of a board of adjustment shall be necessary to reverse any order, requirement, decision or determination of the administrative official and to effect any variation in the zoning ordinance. This is a further safeguard to the exercise of the power entrusted to the board by the legislative body. The court decisions recognize that the power to grant variances must be exercised sparingly and in keeping with the general purpose of the zoning plan and the public welfare. 101 C.J.S. Zoning § 286, p. 1057; 58 Am.Jur., Zoning § 200, p. 1049; Brown v. Beuc, Mo. App., 384 S.W.2d 845, 851[4]; Berard v. Board of Adjustment of City of St. Louis, Mo.App., 138 S.W.2d 731, 733[1].

■ The determination of whether a variance in the application of a zoning regulation should be granted depends on the facts and circumstances of each case. 58 Am.Jur., Zoning § 198, p. 1048; Huttig v. City of Richmond Heights, Mo., 372 S.W. 2d 833, 842[7]. The scope of judicial review of the decisions of the board of adjustment in a zoning proceedings is limited to a determination of whether the ruling is authorized by law and is supported by competent and substantial evidence upon the whole record. Art. 5, § 22, Constitution of Missouri 1945; Pearce v. Lorson, Mo.App., 393 S.W.2d 851, 854[1]; McKinney v. Board of Zoning Adjustment etc., Mo.App., 308 S.W.2d 320, 322[1].

In this case neither a change in the use of the land nor the use of the building is contemplated. The narrow question involved is whether a variance of 10 feet in the height of the addition is warranted under § 916.050(4) of the Code which empowers

the Board to vary or modify the zoning regulations relating to the "construction or alteration of buildings or structures" in case of practical difficulty or unnecessary hardship.

The evidence shows that the building in question is to some extent a special purpose building. It was built to house telephone exchange equipment, some of it of a nature that stories 15 feet from floor to floor are required. The photographs disclose that it is not partitioned as the ordinary building, but is open so that high and long panel boards and shelves or troughs of wiring may be maintained in continuous rows. The increase in the demand for telephone service is so well known that it hardly needs to be supported by evidence, but it was, particularly as applied to this installation. Not only are the number of subscribers increasing, but there is increased usage by present subscribers. The evidence was uncontradicted that if the Telephone Company could not grow in this area it would have to erect another building in another location. The alternative would be to locate a new wire center and cut down on the work handled by this one. Not only would this disrupt telephone service but would be a "terrible burden" in cost to the public. The cost and inconvenience would be borne by the subscribers. There was testimony that four, rather than three, floors were desirable because of the nature of the equipment installed. If the cables are too long, resistance builds up and the equipment will not function properly.

■ Our conclusion is that there was competent and substantial evidence that practical difficulties and undue hardship would exist if the applicant was required to conform to the height restrictions of the existing ordinance, and that the grant of the height variance was authorized by law. The existing building and hence the situation in which Bell found itself was unique and peculiar in that this special sort of building was developed and constructed at its present height under the ordinances then in force. The present ordinance permitted an additional 5 feet in height but that was of no use to the applicant unless it had authority for 10 feet more so that the other story could be added. The Board of Adjustment exercised a sound discretion in granting the variance. In Norcross v. Board of Appeal etc., 255 Mass. 177, 150 N.E. 887[4], the granting of a height variance was held to be a proper function of the appeal board. In Board of Adjustment of City of Tulsa v. Shore, 207 Okl. 381, 249 P.2d 1011, an area variance was granted in that the applicant was permitted to extend the remainder of the front of the building so as to conform with the area occupied by the rest of the building. See also Annotation, 168 A.L.R. at p. 52. The contention that no practical difficulties or unnecessary hardships were established and that, therefore, the Board was without jurisdiction to grant the height variance is denied.

■ The appellants' final contention is that the Board's order was illegal because it constituted a repeal of § 910.050 of the Code regulating the height of buildings in the "G" commercial district. They cite Brown v. Beuc; State ex rel. Nigro v. Kansas City, and Himmel v. Leimkuehler, Mo.App., 329 S.W.2d 264, some of which we have heretofore discussed. None are authority for the contention made. Boundaries of districts and the regulations of the Zoning Code can be amended, supplemented, or changed by the legislative branch of the city; Chapter 917 provides the manner in which it can be done. A variance is in the nature of a waiver of the strict letter of the zoning law upon substantial compliance with it and without sacrificing its spirit and purpose. In re Botz, 236 Mo.App. 566, 159 S.W.2d 367, 372[5]. This is not a new concept. Many years ago it was said that we should be ministers "not of the letter, but of the spirit: for the letter killeth, but the spirit giveth life." II Corinthians, Ch. 3, v. 6.

■ In some situations a zoning ordinance may be valid generally but invalid

in its application to a specific tract. Huttig v. City of Richmond Heights, Mo., 372 S.W.2d 833, 838[2]. A board of adjustment is required to balance with other considerations the difficulties and hardships that may be encountered in applying the regulations to a particular property. 58 Am.Jur., Zoning § 202, p. 1050. A board of adjustment has no legislative powers. It acts administratively or quasi-judicially. Its decisions and rulings cannot have the effect of repealing or amending a law. In this case the decision of the Board was proper and did not have or purport to have the effect of repealing or impairing the force and effect of § 910.050 of the Zoning Code.

We have considered all of the questions presented by the appellants and find them to be without merit. Accordingly, the judgment is affirmed.

All of the Judges concur.